Good afternoon. Our case this afternoon is Orlando Baez v. Stanley Falor et al. Ms. Farley? Good afternoon. May it please the Court, Shannon Farley together with my co-counsel Daniel Pereira representing the appellant Orlando Baez, may we please reserve two minutes for rebuttal. Granted. Thank you. Today I will discuss the Eighth Amendment claim while my co-counsel will address PHS's liability and the retaliation claim. In this case, there is a genuine issue of material fact as to whether or not Dr. Jin exercised medical judgment when he delayed Mr. Baez's one-month follow-up visit to Dr. Seaman, a rheumatologist specializing in lupus, for 17 months. When you say medical judgment, though, that sounds like negligence or malpractice. Your Honor, medical judgment is the difference between deliberate indifference and negligence or simply malpractice. If Dr. Jin can be found to be exercising medical judgment, then it perhaps could be held as negligence, whereas if he is found to not be exercising medical judgment, deliberate indifference can be inferred in the case. Now, this is the issue you describe as the central issue before us, the crucial issue before us. Is there any evidence in the record that in the 17 months at issue, that is, the 17 months following the CT scan, that Baez complained to prison medical officials that he should be taken back to Dr. Seaman? Yes, Your Honor, there is. In the record, I'm not entirely certain on what page, but I can find that for you. We have culled every grievance, every sick call complaint in that 17 months, and in that 17 months, I haven't found one. There is a grievance from 2007, March of 2007, where Mr. Baez states that he filed for sick call repeatedly and that he was not seen. You're talking about returning to Dr. Seaman. Yes, he did in that grievance, I believe, state that in March of 2007. All right. I'll look it up while you continue your argument. Sure. The sheer length of the delay here, coupled with the fact that no explanation was given at the time of the delay, calls any credibility of any later explanation that Dr. Ginn gives here into question. The explanations that Dr. Ginn finally does provide in May of 2008 in his testimony, and then later in September of 2011, are inconsistent with one another. The explanation that Dr. Ginn provides in his testimony is that he admits that no medical reason was given for the 17-month delay. Then in 2011 – Are you arguing that no medical reason is tantamount to liability? No, Your Honor, not in itself. However, at a summary judgment phase where all reasonable inferences must be given to Mr. Baez, as he is the one contesting the summary judgment, no medical reason means no medical reason. And that is in direct contrast with the explanation that he later provides in a litigation document in 2011, which states that he was able to conclude from the CT scan and the x-rays that the follow-up was no longer necessary. This explanation that he provides in the litigation document has no contemporaneous documentation, and several courts have held that when an explanation is provided during litigation and has no contemporaneous documentation, that this in itself calls into question the credibility of that explanation. Further here, we also have several other pieces of evidence that show that Dr. Ginn was not acting with medical judgment, or at least that a reasonable jury could conclude that Dr. Ginn was not acting with medical judgment. Here, Dr. Ginn testified that he understood that the purpose of the follow-up visit was to diagnose Mr. Baez. He also testified that he himself was not able to diagnose Mr. Baez. So this, according to the Seventh Circuit in Hayes v. Snyder, would not make a follow-up visit to a specialist less necessary, but rather quite the opposite. Well, Dr. Seaman seemed to think that the CT scan was important. And it was done in November 2006. And it was normal. And you say in your brief, the blue brief, that normal CAT scan reinforced the need to follow up because it failed to show an alternate cause of Baez's pain, and thus was consistent with a lupus diagnosis. In your reply brief, you go even further. You say the negative CT scan supported a lupus diagnosis by failing to – how do you make that leap? Your Honor, when the normal CT scan came back, it indicated that lupus remained a possibility. Sure, so was pregnancy. I mean, it was a normal CT scan. Yes, Your Honor. It was a normal CT scan. The purpose of the CT scan was to determine if Mr. Baez was suffering from some other illness. And Dr. Jin understood that that was the purpose of the CT scan. Here, it wasn't simply that there was a normal CT scan, but also that other tests had indicated that Mr. Baez remained positive for some type of autoimmune disease, and that Dr. Jin did not conduct – It was difficult to figure that out, right? We have a tough diagnosis. We've got a lot of doctors involved. And even Dr. Seaman, who was a rheumatologist, we really didn't get the answer to Mr. Baez's conundrum until he went to the facility to which Dr. Seaman referred him, right, the lupus facility? Is that right? Yes, that's correct, Your Honor. But here, this is not just a case of a doctor misdiagnosing or simply failing to put together the pieces, but rather a case of a doctor failing to attempt to gather the pieces of a diagnostic puzzle. Here, Dr. Jin – Well, you're leveling that charge at Dr. Jin, I assume, right? Yes, Your Honor. But Dr. Seaman, the expert, you know, a specialist, he, as I recall, the initial diagnosis was for the less serious form of lupus, right, the SCLE rather than SLE, correct? Yes, Your Honor. I see my time has elapsed. May I have permission to briefly conclude? No, you're on yellow, which means you can – Oh, keep going? Okay, sorry. So I'm challenging you on the notion about the diagnosis, because if Dr. Seaman himself came up with the SCLE diagnosis when, in fact, later we learned that the correct diagnosis was SLE, doesn't that make it exceedingly difficult for you to show that Dr. Jin or anybody else acted with deliberate indifference in failing to diagnose him correctly earlier? Your Honor, while Dr. Seaman was not able to diagnose Mr. Baez with SLE at the second visit, he was the one who made the recommendation that Mr. Baez be brought to the Lupus Center for Excellence. Only after – that was in January 2009, after Dr. Jin called Dr. Seaman to ask if he had any other recommendations, correct? Your Honor, it's unclear in the record that that was the first time that Dr. Seaman had made that recommendation. As he stated in the record, he said, I again recommend that you bring Mr. Baez for a second opinion to the Lupus Center of Excellence. So although it's – Where is the first time? Where does the first recommendation appear in the record? It's not documented explicitly in the record. However, it is stated, as I said, he said, again, I make this recommendation. So it's possible that this recommendation was made verbally or in a document that wasn't provided in the record. With the limited amount of time I have left, I would like to turn to the injury argument. I actually would like to ask you a question. Sure. Dr. Jin ultimately prescribes a medication, Mexotretrate. Why don't you explain it? Pronounce that for me. The name of the drug that he – he can't do it either? Good. No. He ultimately prescribes it at the suggestion of the gentleman from – the doctor from Pittsburgh. Yes. Doesn't that show a lack of indifference, that he was acting on what he learned to try to solve the problems of Mr. Baez? That drug was provided after Mr. Baez was brought to the Lupus Center for Excellence. So the fact that Mr. Baez eventually did receive treatment does not excuse the fact that he did not receive any treatment for his lupus during the 17-month delay. What evidence do you have during the 17 months that Dr. Jin's subjective state of mind was that he wished to inflict unnecessary pain on your client? The evidence we have that a reasonable jury could conclude that Dr. Jin was acting deliberately indifferent is that his explanations are inconsistent. When he does provide explanations, the explanation that he does provide makes no sense. As I stated earlier, the purpose of the CT scan was not to confirm or not confirm lupus. It was to determine whether Mr. Baez was suffering from a different condition. Dr. Jin stated that he understood that the follow-up was not contingent on the CT scan, yet somehow determined later on that it was. There's evidence in the record, as the defendants have pointed out, that Dr. Jin or someone else at SCI Green attempted to schedule the follow-up appointment before the CT scan results came in. If the appointment had been contingent on the CT scan results, one would believe that the follow-up would not have been scheduled until after those results had came in. Dr. Jin further never communicated his decision to Dr. Seaman to not follow up. He also never communicated to Dr. Seaman that the test that Dr. Fahler had ordered after the first follow-up, or after the first visit, rather, in 2006, had actually returned positive for an autoimmune disorder. He didn't communicate these test results to Dr. Seaman until 2008. There's no indication in the record as to why he decided to not communicate that until 2008. Additionally, no follow-up. So there's nothing new that could be presented to the jury? No, Your Honor. This is all evidence. Everything you just said is what would be presented to the jury, right? Yes, Your Honor. Everything. Then the record is complete. Why isn't it a legal determination as to whether those facts that you just mentioned rise to the very high level of deliberate indifference? It is a question because here the sheer length of the delay, coupled with the fact that there is no explanation provided in the record for the time, that all of this evidence taken together could point to something other than medical judgment. And here, if there was not medical judgment used at the time, then Dr. Jin could be found. That is very speculative to me. You've got a 17-month period of time where you're alleging a failure to take him back to Dr. Seaman. Really, that's the thrust of your argument. And there is nothing that I can find in that 17 months. Meanwhile, he was flooding prison officials with grievances, sick call requests, everything, but requesting to go back to Dr. Seaman. Dr. Jin, at the time, was the medical director of the prison. There's 1,800 to 1,900 prisoners, on average, housed at Green. I think you're trying to suggest that he should have been on top of this prisoner every step of the way. And he's the only one really at issue on this Eighth Amendment complaint, isn't he? Well, Your Honor, the other defendants are at issue on this Eighth Amendment claim as well. But let me answer the first part of your question. It's not simply that Dr. Jin failed to stay on top of Mr. Baez, but rather he affirmatively admitted that no explanation was given for this delay and then later provides an explanation that there's no record of before that 2011 explanation. Also, although Mr. Baez continued to show symptoms of lupus, no follow-up testing was conducted on him between July 2006 and 2008. Although he did continue to submit grievances and sick call slips, he was only seen a handful of times during this delay. And those were for discrete instances of rectal bleeding, which the defendants allege is not related to his lupus, an incident involving handcuffs that were too tight, and an incident of rash. That incident of rash could have been related to the lupus. However, Mr. Baez was never brought back or further tested for an autoimmune disease during the 17-month delay. Also, the proximity between the follow-up visit and the motion for injunctive relief calls his explanation into credibility, as well as the statements that Mr. Baez stated in his sworn affidavit that were made to him from Dr. Jin, which were insulting and inflammatory. You said that he was only seen a handful of times between 2006 and 2008? Yes. The record seems to suggest it was over 125 times. Between 2006 and 2008? That was the number of times he had some kind of contact with a health care provider. That's mistaken? Well, his medical records, the medical chart itself only indicates that he was seen a handful of times between 2006 and 2008. Okay. So while he may have grieved or made sick call slips, he was only seen. All right. We'll hear you on rebuttal. Thank you. Thank you. Mr. Pereira? May it please the Court, Daniel Pereira for Appellant Mr. Baez. I would just like to briefly address PHS's liability in this case, as well as Mr. Baez's retaliation claim. In this case, a question exists whether if Dr. Jin could be found liable for deliberate indifference, whether PHS could be held liable for his decision not to return Mr. Baez to Dr. Stephen for 17 months. 1983 liability attaches to a municipality, or here PHS, where a person with final decision-making power in a specific subject area chooses a course of conduct that leads to a constitutional deprivation. As medical director, Dr. Jin was PHS's decision-maker at SCI Green for medical decisions within the prison. Additionally, Dr. Jin testified that he was the decision-maker specifically in regards to Mr. Baez's care. As such, it's our position that if Dr. Jin, if a jury could find Dr. Jin deliberately indifferent, that a court could also find that because Dr. Jin was making the final decisions on health care within the prison, that his actions are attributable to PHS directly. What's the policy or custom that you say PHS had? Well, there's various ways you can show policy. We don't contend that there's an explicit policy here that Mr. Baez put into record. Our contention is simply that as medical director, Dr. Jin is the decision-maker within the prison, at least in the area of medical care decisions. And as such, his decision not to return Mr. Baez to Dr. Stephen for 17 months, if found deliberate indifference, found to be deliberate indifference, could be attributable to PHS. Had that ever happened before, to your knowledge, at this prison? That Dr. Jin did not return someone for referral, who should have been? Not to our knowledge. So if this is the first time it happened, by necessity it's not a policy. This is the first occurrence. I think that would indicate that Mr. Baez has not necessarily shown it's a custom, but as the Supreme Court held in Pembauer, even one instance by one official can be held to be a policy attributable to the municipality where that person is the final decision-maker. What were the facts in that case? In Pembauer, it was a sheriff who broke down the door, I believe, to arrest a witness who failed to appear at a grand jury, and a prosecutor had also advised him to break down the door. And the court held that even though it was one instance with one person whose door was broken down, that because the sheriff had the decision-making power to decide, and the prosecutor, the decision-making power to break that door down, that that action was attributable to the municipality. And that it was a policy? Legally speaking, I suppose, yes. Given my limited time, I'd also like to briefly address the retaliation claim in this case. Mr. Baez can show that the delay in returning him to Dr. Seaman was motivated, at least in part, by his protected conduct through circumstantial evidence, including, in this case, unusual temporal proximity. Mr. Baez filed this lawsuit on November 7, 2006. His CT scan took place the very next day on November 8, 2006. Up until that point, Dr. Ginn made every indication that his plan was to return Mr. Baez to Dr. Seaman after the CT scan, and then suddenly, without recording any explanation in the record, does not send him back, does not send him back for 17 months, does not do any follow-up tests. Mr. Baez is barely seen in that two-year period. And our contention is that that timing alone is sufficient, at least to go to a jury, to consider whether the delay was, at least in part, motivated by Mr. Baez filing this lawsuit. But how do you juxtapose that with everything else that happened, all the other medical care he got, the fact that he was prescribed the medication that had been recommended by the University of Pittsburgh? The hundreds of grievances and complaints, sick call requests, hundreds of them. Well, there's the medical – most of the medical care that Mr. Baez was provided happened before he filed this lawsuit, and during that time was when he was filing the grievances. It's true that he did eventually get plaquenilin restasis after it being recommended by the Lupus Center. But, of course, that happened after Mr. Baez filed the motion for a preliminary injunction and the treatment resumed and Dr. Jin finally sent him back to Dr. Seaman. Our contention is that the question here is why Dr. Jin did not send him back for such a long period in the middle of all of this. And given the timing that the CT scan took place the day after he filed this lawsuit and subsequent to him filing hundreds of grievances, there's at least a jury question whether that was motivated by a retaliatory motive. I see my time is up. Thank you, Mr. Frater. Thank you, Your Honors. Mr. Gold? Good afternoon, Your Honor. May it please the Court. I am Alan Gold. This is Tanya Sweet. Oh, I'm sorry. I don't need it. I'm sorry, Your Honor. If I am too loud, please let me know. It's the hearings sometimes. I think I'm whispering and I'm shouting. I'll hold it. I'm sorry. First of all, Judge Barry was correct when she said that there was no pain. I'm sorry, that there was no request to see Dr. Seaman in that March 2007 grievance. We just pulled it and looked at it. In addition, the only thing they're relying on to show pretext is the fact that Dr. Jin did not put in his medical record why he was not going through with the test. Now, there's no evidence that that's the kind of thing doctors put in their medical records. I don't know. I've never seen it. They could have brought an expert in. They could have asked one of the other doctors. Is that what you usually do? It's almost like the blank paper story, Your Honor, where you go up to a witness on the stand and go, this paper, wasn't there something written on it? You can't prove it. How did it become blank? That's what they're doing with that argument. I understood their argument to be that at his deposition he said there was no medical explanation for why the delay had occurred. But in his affidavit, he said, this is my explanation. I didn't think it was necessary. Your Honor, that was misrepresented a little bit. They looked at 977 of the trial transcript. If you look at 966 of the trial transcript, you'll see that the question he was asked is, did you put anywhere in your medical chart that there was a medical explanation? No, but I have an explanation. He said it again. I have an explanation. And then he was cut off. And the case went on. So he had an explanation there. We just never heard what it was. And he didn't say he had no medical explanation. He said he had no explanation. He said he didn't put it in the record. As a matter of fact, the attorney for Mr. Bias kept on calling him nonresponsive. All I want to know, she says, is, is it in the chart? That's the only thing you're being asked. And he said, but I have an explanation. I'm sorry. But he said, I have an explanation. That hardly is enough to overcome the presumed valid judgment rule, Your Honor, which this court has adopted. And the test is whether there was a substantial departure from accepted professional judgment, practice or standards, as to demonstrate the person responsible actually did not base the decision on such judgment. Now, are we to believe that not putting this in a medical record and then explaining yourself in a verification is a substantial departure? And what's the other point that they make? After the injunction is filed, the motion for an injunction, Dr. Chin, quote, sends him off to Dr. Seaman with the same results. Now, Dr. Chin could have all kinds of explanations for that. But certainly an explanation that he thought he had made a mistake, in and of itself, isn't enough to overcome his presumption. And suppose he honestly reconsidered. But more importantly, do we want to punish people who send people off for medical care? Do we want to say, listen, you have to consult your lawyer when you deny him care, and now you have to make sure that you're not doing it too close to the injunction hearing date. This is nowhere close to the evidence. Well, the record does circumstantially indicate that it was some oversight or something on Dr. Chin's part. I mean, it's pretty coincidental that he got the referral right after the litigation heated up, isn't it? It is, but there are a million other explanations, Your Honor, just as valid. Like what? Like, give me a few. Like he looked at the case again, or he figured that the best course was no longer to fight him and just give him what he wants, no matter whether he needs it or not. That's what happens many times in these cases. And why aren't those jury questions? They're not jury questions because they don't reach the level of deliberate indifference. Sending somebody off to get care. All right, those explanations don't, but what if the explanation is, for 17 months I've been trying to torture this guy, and I have to stop torturing him anymore because they've gone to court? What if that's the explanation? Except the record doesn't support that. The record is silent, isn't it? Pardon? On what the explanation for the delay is? Just the affidavit that was prepared. Well, they had an opportunity to cross-examine him, Your Honor, when he was represented by counsel, by at least five different counsel. They were at a deposition, and they could have asked him what the explanation was. Instead, they shut him up. They shouldn't be able to benefit from that. And your position is the affidavit is the real explanation? The affidavit's the real explanation. And that that affidavit can be read harmoniously with the deposition transcript? If you take everything in context. That's right. There's no contradiction at all. And it's their burden to show that there are material facts in dispute. That's right, and they haven't met that burden. They've come nowhere close. If you look at cases like White v. Napoleon or Dahmer, where this court reversed the district court on summary judgment, there's so much more. It doesn't even come close. In White v. Napoleon, what happened? There were about seven or eight different cases where the doctor refused to follow the medical care given by outside specialists. What he knew, he knew and admitted that the care that he was giving was harmful or ineffective. That's not this case. And in Dahmer, what happened? It was reversed. This doctor kept on sending the guy to experts, six, seven or something, a multitude of experts asking whether he needed physical therapy when he already had an unchallenged opinion from a doctor saying he did. He dragged it out so long that the guy was no longer eligible for physical therapy and was a stroke victim. That's not this case. You know, in their brief they say, is there ever a case if you use our test where the doctor wouldn't win? Yeah, and there are plenty of them. And we just discussed two of them. And in addition, there's no damage. Delay has to be with some kind of damage. He got the right treatment. And what happened? You're saying the disease is incurable. Well, not only that. But their argument is that the medical evidence suggests that SCLE can progress to SLE, and had he been treated in a timely fashion, his condition would not have transitioned to SLE. Isn't that their argument? It seems to be. But the problem is the record doesn't support it. Dr. Seaman says it's rare. And there's no indication it happened here. Well, he has SLE, correct? That's right. But there's no reason to believe that it was caused by the delay, that anything could have been done to reverse it. It's very rare that it happens. And not only that, it's extremely – he needs some kind of expert. The jury can't speculate on what the delay caused. What we do know is the drug therapy didn't work. All you read about in their first brief is, if he had just gotten these terrific drugs at the Lupus Center for Excellence, he'd be fine. Well, Your Honors, he's been there since 1909, every six months, with Dr. Chin carrying out every order to the letter for five years. And guess what? He says in his deposition, in this case, in the Western District case, as late as 2011, what's he say? He says, I'm in the same shape I was in 2005. Well, that's not what they're saying now, because the blue brief at 15 says the pain has not gone away entirely, end quote, or as much as he would like, and that he would likely have some discomfort for the rest of his life, end quote. So, Your Honors, he just sued Dr. Chin again in the Commonwealth Court. I sent Your Honors copies of that opinion. And he argued that he was in pain, that nothing worked. It was thrown out on March the 14th. That's why it's not in the briefs. I took advantage of the rule, which permits you to submit a case, that comes out after the brief. And what's he argue? He argues that Dr. Chin ought to send him to a gastroenterologist and a pain specialist. And what does the three-judge panel of the Commonwealth Court hold? It's a professional dispute. It's malpractice at most. And this was on a motion to dismiss, Your Honor, which they call permitting objections in Pennsylvania. Now, turning to PHS, if I may, policy and practice. There's a real problem here. First of all, this court and the Supreme Court of the United States has said, guess what? The jury doesn't decide who the policymaker is. The judge does. It's this court's, it's the Jet case. It's in the brief. And then it's BS versus Somerset County, which is not in the brief. So I will give the citation, if it's okay. 704 F3D 250, 275 Third Circuit PA 2013. And in that, the court says it's for the trial judge all the time. It's never a jury issue. So if Your Honors find that there was some kind of policy, they can't find who the policymaker was, unless they're going to substitute themselves for the district court. It's the intent that the district court judge do that. But there isn't any policy. Well, don't we know that Dr. Jin's the policymaker here? Well, there's a real problem with that argument, Your Honor. The argument is that in this case, if you look at 812 of the record, I think it is, you'll see that when he put in for the CAT scan test, he had to get permission from the regional director. So it's our position that not only isn't he a final policymaker for the test, without the regional director. And guess what? Well, when Mr. Baez was finally sent to Dr. Siemens, was that approved by that same body? It's not in the record, but I believe it was. Everything has to be approved. They've been sued for that. I don't want to give you any ideas. They've been sued for that on the argument that the system takes too long. If you have to listen to a deposition about it, like I have about a hundred times, unfortunately, what happens? This doctor sends a note to that doctor, who then sends it to Camp Hill. What's done at Camp Hill, doctor? I don't know. So you're saying it works a little bit like the private sector? It works exactly like the private sector. Actually, it works like a government bureaucracy going wild. And sometimes they can – I'm not sure that's beneficial to the health care of the clients. Well, I understand, but welcome to managed care. Dr. Gene was not a policymaker. In addition to that, if you look at the affidavit of the vice president of the Western region at the time, he says they had a policy of requiring doctors and health care workers to, quote, give the best care possible. They would never have approved a policy or practice designed to keep him away from a referral that he needed. But then again, how can not being sent out for a referral one time be deliberate indifference? It happens every day in managed care, and it may not even be malpractice because in five years it might be the standard of care. We have nothing further for you, Mr. Gold, unless there's anything else you want to. No, I believe that's it, Your Honor. Okay, thank you. We'll hear Ms. Farley on rebuttal. Ms. Farley, would you begin by addressing this factual dispute regarding what the record says and what it doesn't say? Sure. Exactly which portion would you like me to address? Mr. Gold has pointed to the March 2007 grievance and said that it does not say what you represented to the court. Yes, Your Honor. I have that right in front of me right here. That's in the record on page 1833, and this grievance doesn't specifically state that Mr. Baez would like to be seen by Dr. Seaman. However, it does make reference to the fact that he continues to be in very serious life-threatening pain from his lupus, which he has yet to receive treatment for anything at all for his serious medical condition and need. Let's go back to Judge Barry's question, which I think was, during the 17-month period that you cite as critical to the case, did your client ever request to go see Dr. Seaman? His request for relief stated here is for the immediate medical treatment and care for my serious medical condition. So though he does not specifically state that he would like to go back and see Dr. Seaman, the fact that he knew that he was supposed to. The answer to my question and to Judge Barry's question is no. Yes, I did misspeak. I did believe that it did specifically state that he requested to go back and see Dr. Seaman. However, he did know that he was supposed to go to Dr. Seaman for a follow-up visit and that that follow-up visit did not occur. So any request for proper treatment could be seen to be a request to see Dr. Seaman. Are there any? You know, one thing that's striking about this case is the extent of the medical record. Do you have any case law from any circuit where you can point us to decisions holding that deliberate indifference occurred with even remotely the extent of the medical record as this one? Your Honor, in Greeno v. Daly in the Seventh Circuit, the medical record was similarly lengthy and the delay was also for a similar period of time. There the defendant was found to have an esophageal ulcer after a period of several months delay, and he actually was seen by a doctor several times during that period of time and was simply given medications and told that nothing was wrong with him. Similarly, in Farrell v. West. But you said several months. Yes, a several-month delay. I'm not certain exactly. We're talking about years. And grievances and complaints that occupy 45 pages of the district court's opinion just to set forth. I think that's what we're talking about. Is there a case similar to that over a period of a very long time? In Farrell v. West there was a 15-month delay in dental care where there was several pages of documented medical records and the same. However, in this case, Your Honor, the medical records from the period, the 17-month period of delay, the medical records themselves are only about four to six pages from the 17-month period. And given the extensive, as Your Honor stated, amount of complaints and grievances and other things of that nature before and after the delay, four to five or four to six pages of medical records is a very small amount of medical records given. Those records are very hard to read. Yes, they are. So, I mean, I don't know how much we can put on them. I would like to also briefly address the fact that defense stated that in the testimony that Dr. Jin was cut off and had stated that he had an explanation but was unable to give it. The exact statement on page 973 of the record is, and there was no medical reason given for this delay, was there? And Dr. Jin's response, no. But if you look ahead of that and look at the lines that precede it, that he's being shown a consultation record. So I think your adversary was saying this answer was whether or not the consultation record disclosed a reason. Is he reading it wrong, and if so, why? Your Honor, the consultation record does not show a reason. However, later in the record, Dr. Jin is also asked why the delay in the CT scan was scheduled, and he cites to a wishy-washy doctor that Mr. Baez, and there was complications, and then there was a test, and never states that the delay in medical care. Well, he wouldn't consent to it for a while, for quite a while. He did want to see his doctor before he signed. And then he wanted to see him later, and yeah. It was actually only a period of about a week and a half that it was delayed due to Mr. Baez himself. There was actually a test that was scheduled, Dr. Seaman's schedule, the test that also caused it to be further delayed. Also, the defense- Can we go back to 973, though? I'd like to just get an answer to that, if you don't mind. Was the answer that was given about being no medical reason, was it in response to the absence of information in the consultation record? And I'm looking at appendix 973, lines 14 through 22. Yes, it could be read to be taken in that way. However, it does not specifically state that no medical reason was given in the delay. It simply states that there was no medical reason given for this delay. So it could be taken either way. And at this stage, all inferences must be drawn in favor of Mr. Baez. The defense asks you to draw several inferences in favor of the defendants. And at this stage, the credibility of Dr. Ginn is not-it's a role for a jury to determine, not for this court on summary judgment. Just one last thing I'd like to address very briefly, if that's okay. The defense also cited for the PHS liability, the policymaker argument, that Dr. Ginn had to consult with the regional director prior to scheduling. However, that citation is actually from before Dr. Ginn was made the medical director of SCI Green. That was when Dr. Fahler was the medical director. Dr. Ginn replaced Dr. Fahler in October of 2006, and the CT scan was scheduled to be conducted before October of 2006. Thank you. He actually replaced him in August. He became the acting medical director. However, he still had to consult before he was. Thank you, Ms. Farley. Thank you. The court expresses its appreciation to Ms. Farley, Mr. Pereira, and especially to supervising attorney, Mr. Frankel, for handling this case pro bono. Briefs were excellent, and we'll take the matter under advisement. Thank you. I just wanted to thank the panel for its extreme courtesy to me and the staff for their incredible cooperation. Thank you. Never a problem. We're happy to have you. Thank you, Mr. Gould.